C. E. LAWHEAD, *Assignee, etc. v.* L. W. STEWART *et al.*

(No. 9144)

Submitted January 21, 1941. Decided February 11, 1941.

*George R. Farmer* and *Grover C. Worrell,* for plaintiff in error.

*Bailey & Shannon,* for defendants in error.

KENNA, PRESIDENT:

By this notice of motion proceeding C. E. Lawhead, assignee of the First National Bank of Pineville, sought to recover from L. W. Stewart, as maker, and F. N.

Stewart, as endorser, the sum of $7,545.00, being the principal and interest of a promissory note dated the twenty-third day of December, 1929, payable on the twenty-third day of April, 1930. From a judgment based upon a verdict for the defendants, the plaintiff below prosecutes this writ.

In addition to pleading the general issue, the defendants filed a special plea of failure of consideration, to which the plaintiff filed a demurrer and special replication alleging waiver and estoppel. The case went to the jury on the question of whether the note upon which recovery is sought is, in the hands of plaintiff, subject to the terms of a contemporaneous instrument executed by the maker and payee. The legal questions hereinafter discussed were properly raised by the motion of the plaintiff to set aside the verdict of the jury and grant him a new trial. This is the second review of this proceeding, the first opinion being reported in 122 W. Va. 80, 7 S. E. (2d) 350.

The plaintiff acquired this note on July 11, 1938. The origin of the indebtedness it represents dates back to October, 1926, when Dottie Wikel sold and conveyed to Lewis W. Stewart an undivided half interest in a fifteen-acre tract located in the suburbs of Pineville on the south side of the Guyan River for the sum of $5,000.00, all of which was represented by a note payable in four months and secured by a vendor's lien. Simultaneously with the execution and delivery of the deed, Dottie Wikel and C. M. Wikel, her husband, executed an unrecorded instrument which, after recitals giving the correct consideration and terms which deviated from the recitals of the deed, contained a provision obligating Stewart, the purchaser, to sub-divide the available part of the fifteen acres into lots and proceed to dispose of them for the benefit of the mutual owners, the expense of the lay-out to be equally divided and the cost of sale limited to twenty per cent of the sale price. This collateral agreement also stipulated that the purchase money should be payable from the proceeds of the sale of lots and that the payee would "carry" the note or notes for the length of

time necessary to sell a sufficient number of lots to discharge the purchase price of the Stewart interest.

Shortly after this transaction was concluded, the Stewart note was discounted at the First National Bank of Pineville by C. M. Wikel the husband of Dottie Wikel, who was and had been its cashier and a member of its board and discount committee for a.number of years, the fifteen acres of land having been conveyed by the bank to Mrs. Wikel in nineteen hundred and nineteen.

By decree entered in February, 1930, the deed to Dottie Wikel and that from her to Stewart were annulled by a decree of the Circuit Court of Wyoming County as having been executed for the purpose of hindering the creditors of C. M. Wikel, who supplied the purchase money. This, of course, had the effect of cancelling the bank's lien upon the fifteen acres. The defendants contend that it, by abolishing the only source of payment of a non-negotiable instrument upon which their signatures appear, relieved them of further obligation.

The question of whether the plaintiff is entitled to recover, therefore, rests upon two questions: (1) was the First National Bank of Pineville informed of the terms of the collateral instrument at the time of acquiring the Stewart note, so that it took it with knowledge that the source of its payment was limited to one-half of the proceeds of the sale of lots, and (2) if the bank was so informed, did both of the Stewarts, knowing that Mrs. Wikel had failed to keep her agreement that she would hold the note for the necessary length of time for its discharge in that manner, by paying interest upon the note and renewing it several times after it came into the bank's hands, waive the agreement limiting the manner in which it should be met? The single instruction tendered by the defendants was drafted on that theory and was given without objection. As to the source of payment being expressly limited, see this Court's opinion in the former review hereof, referred to above.

Wikel testified for the defendants and stated categorically that at a regular meeting of the board of directors of the Pineville National Bank the board was fully in-

formed by him as to the terms of the side agreement and understood fully the definitely limited source of payment of the Stewart note. Will B. Cook, the only other surviving member of the then board of directors of the Pineville National Bank, testified that he had a faint recollection of the Stewart note, but that he had no recollection whatever of a contract limiting its source of payment.

The original records of the Bank of Pineville, including the minutes of its board meetings, had been burned at the termination of the receivership in compliance with an order of the Circuit Court. Mr. Cook, upon cross-examination, stated that his duties as assistant cashier prevented his constant attention to the meetings of the board of directors and that it was possible that the information concerning the side agreement might have been orally communicated to the board in his absence.

In this state of the testimony, we are of the opinion that it cannot be said that a clear preponderance favors the plaintiff's contention. Without doubting the veracity of either Wikel or Cook, it seems clear that the jury might well conclude that the board of directors was fully informed concerning the contents of the collateral instrument during Mr. Cook's absence. It follows that if the Bank of Pineville, through its board of directors, acquired the Stewart note with notice of the conditions which were a part of the understanding out of which it grew, that Lawhead, the plaintiff, who purchased the paper after its due date took it subject to the same infirmities, terms and defenses that bound the bank. Certainly that is true as to the makers of the note, and since the nature of the paper is the foundation upon which rests the obligation incurred by placing a signature upon its back, it follows that the non-negotiability of the paper when it was transferred to the bank and the information with which it was then charged, served to qualify the contractual liability of the persons whose signatures appeared upon the paper at that time. The bank, it is true, became the owner of formerly indorsed paper, the appearance of which was that of a negotiable instrument, but

prior to acquiring title the bank was fully informed concerning the binding side agreement limiting its legal effect. As to the effect of assigning or endorsing non-negotiable paper, see *Nichols' Ex'r.* v. *Porter,* 2 W. Va. 13, 94 Am. Dec. 500, and *Hughes* v. *Frum,* 41 W. Va. 445, 23 S. E. 604. Neither of the cited cases, however, apply where the terms of the non-negotiable contract expressly limit the source of payment.

It not appearing that the position of the then holder was altered to its prejudice by the renewal and payment of interest, but to the contrary, that whatever consideration there was involved moved to the owner, we are of the opinion that there is no waiver nor estoppel to preclude the defendants from relying upon the collateral writing as a defense.

The judgment of the Circuit Court of Wyoming County will therefore be affirmed.

*Affirmed.*

Fox, JUDGE, dissenting:

I cannot agree to an affirmance of the judgment in this case. I think we are bound by the finding of the jury on the question of notice to the bank of the so-called "side agreement," and I concur in the syllabus statement of law. My dissent goes to the application of this law to effect a release of the makers and endorsers of the note in question.

The note sued on is a negotiable promissory note, necessarily contains an unconditional promise to pay, and the original obligation was negotiated before maturity. It is said that at and before the same was negotiated and discounted by the First National Bank of Pineville, the bank had notice of the "side agreement." Conceding this, the question arises, of what did this agreement give notice? This requires an examination of the writing itself.

This agreement, dated October 26, 1926, provides that the land for which the note was executed should be subdivided into town lots and sold, and that the coal therein should be mined, or, if not mined, an additional sum

should be paid. This, of course, means that at the date of the negotiation of the note, all parties connected therewith as makers or indorsers knew that it was contemplated and agreed that the land should be sold. This was as much a promise and undertaking as the unconditional promise to pay contained in the note itself. Then follows the crucial provision which, it is contended, required the bank to resort solely to the property for which the note was executed in the collection thereof, and released the makers and indorsers of any personal liability thereon. This provision reads as follows:

> "It is further understood and agreed by and between the parties hereto that the party of the first part is to carry said note or notes evidencing said purchase price for such a length of time as may be necessary to sell a sufficient number of lots and collect the sale price thereof so that the share of the party of the second part in such sales amounts to a sufficient sum to pay off and discharge the principal and interest of said purchase money note or notes."

It seems to me apparent that this agreement did not release the original obligation to pay the note. It only provided that the note should be carried until certain sales of property could be made and the proceeds thereof collected. The law would imply an undertaking that these sales should be made within a reasonable time. Certainly refusal to make sale as agreed would have released the payee of the note of the obligation to continue to carry the note; and would have given the owner of the note, in this instance, the bank, the right to enforce the same according to its terms. It would seem inequitable to hold that a person may make a promise to pay a given sum, subject to a condition which can be performed by him only, and that his failure to meet such condition would entitle him to a release from his original promise.

The lots were never sold, nor was any coal mined, because the title to the land failed. In a suit in which all the makers and indorsers were parties, the land was decreed to be the property of C. M. Wikel, and it was sold

in such suit to meet the claims of his creditors. A situation arose, through no fault of the bank, when the "side agreement" could not be carried out. There was then no possibility that the note could be paid out of the proceeds of sale of this property. I do not think this operated to release the makers and indorsers of the note. The risk of title was not assumed by the bank; it only took the note with notice that it might be required to carry the same pending the sale of certain specific property, for which it was given, and when the agreement to sell the lots and mine the coal was breached, under the circumstances shown by the record, the bank had the right to enforce the note according to its terms, and it follows that the rights of its assignee are the same. If this be true, then the plea of the defendants did not set up a good defense. Objection to the same should have been sustained, and a verdict in favor of the plaintiff should have been directed.

I do not think the passing reference to the "side agreement," contained in the opinion rendered in this case on a former writ of error (122 W. Va. 80, 7 S. E. [2d] 350), which refers to this agreement as one "to the effect that the note was to be paid solely from proceeds of sale of this land," should bind us as to the true interpretation of this agreement. That case was decided upon points which did not require a consideration of the true meaning and effect of the agreement, and a decision as to such meaning was not called for upon that submission.

I would reverse the judgment, set aside the verdict and grant a new trial.